**In re Richard Raymond CURRY, Debtor.**

**Bankruptcy No. 4–93–1748.**

United States Bankruptcy Court,
D. Minnesota.

Nov. 19, 1993.

**814**

John A. Hedback, Roseville, MN, for debtor.

G. Martin Johnson, Johnson and Wentzell, Ltd., Minneapolis, MN, for Trustee.

Keith J. Broady, Abdo & Abdo, P.A., Minneapolis, MN, for Robert Casselman.

## MEMORANDUM ORDER DENYING EXEMPTION OF DEBTOR'S HOMESTEAD

NANCY C. DREHER, Bankruptcy Judge.

The above-entitled matter came on for hearing before the undersigned on the 29th day of September, 1993, on the trustee's objection to the claimed exemption of Debtor's homestead. Appearances were as follows: G. Martin Johnson for the trustee; John Hedback for Debtor; and Keith Brody for Robert Casselman.

### FACTS

1. The debtor, Richard R. Curry ("Debtor"), has been involved in real estate for over 30 years. Debtor became a licensed real estate agent in 1959 and became a licensed broker in 1964. Debtor is currently self-employed in real estate development.

2. In approximately the fall of 1985, Debtor met Robert J. Casselman ("Casselman") who was also involved in real estate. Soon thereafter, Casselman leased office space to Debtor and they worked together on certain real estate developments. Apparently, Casselman assumed a more managerial role while Debtor focused on the development of projects. Presently, Debtor continues to share office space with Casselman but does not pay for phone or secretarial service. Nor does Debtor pay rent. According to both, Casselman does not employ Debtor. Rather, they assert that the relationship is an independent one, with the exception of Debtor's consultation services he occasionally provides Casselman.

3. By 1985, Debtor was insolvent.

4. Also by 1985, Debtor was involved in a divorce proceeding with his wife, Nancy C. Curry. While the parties are currently separated, the divorce is not final.

5. In 1986, Debtor was living in a home in New Hope, Minnesota. The home was sold when Debtor moved into a new home in Bloomington.

6. On August 20, 1986, Debtor and Nancy Curry entered into a real estate purchase agreement ("Purchase Agreement") for 9331 Xylon Circle, Bloomington, Minnesota 55438,

and more legally described as follows: Lot 9, Block 1, Marce Woods, according to the recorded plat thereof ("Property"). The terms of the Purchase Agreement provided for a purchase price of $171,500.00 with $5,000.00 earnest money being paid down and the balance of $166,500.00 cash due on or before October 25, 1986.

7. On September 5, 1986, the Internal Revenue Service ("IRS") filed a federal tax lien with the Hennepin County Recorder against Debtor in the amount of $50,057.94.[1] At the time two other judgments had been filed against Debtor: one dated May 25, 1984 in the amount of $3,566.00; and the other dated September 4, 1985 in the amount of $482.34.

8. On October 1, 1986, Debtor and Nancy Curry assigned all rights, liabilities, and interest in the Property to Casselman ("Assignment"). No consideration was provided.

9. On October 13, 1986, Debtor and Nancy Curry, as "Owners", entered in to a "Contract for Deed" ("Contract") with Casselman as "Nominee", pursuant to which Casselman agreed to deed the property to Debtor and Nancy Curry under certain conditions. The Contract did not mention a purchase price. The Contract was not in standard form. Rather, in pertinent part it provided:

1. *Delivery of Deed.* Nominee hereby agree[s] to execute and deliver to Owners upon demand, a deed conveying to Owners, Nominee'[s] entire right, title and interest in the real property....

\* \* \* \* \* \*

2. *Title Arrangement.* This Contract for Deed is executed as part of a "financing arrangement." Owners are the occupants of said lot and are in possession on the date first above written. Legal title has been taken in the name of Nominee by a deed from Susan J. Kibby as *part of a financing arrangement because of title clouds that could arise if the title were taken or held in the name of Owners at this time.*

Owners have made all the payments on the purchase of said Lot and shall make all payments on encumbrances thereon in the future, and occupy the same as their homestead.

3. *Possession and Other Rights and Burdens of Ownership.* Owners have possession of said Lot; and so long as Owners own the vendee's interest in this Contract for Deed, Owners shall retain possession of said Lot.

So long as Owners own the vendee's interest in this Contract for Deed, Owners shall receive all profits, rents and other benefits of ownership of said Lot, and Nominee shall not receive any of such benefits.

So long as Owners own the vendee's interest in this Contract for Deed, Owners shall pay all current real estate taxes, installments of special assessments, mortgage payments, and all other current bills attributable to the ownership of said Lot.

If Owners desire to sell such Lot, it may direct Nominee (to be joined by spouse) to execute all documents to transfer title to the purchaser, and Nominee shall do so promptly, provided that all costs of documents and transfer shall be paid by Owners.

(emphasis added).

10. On October 30, 1986, Susan J. Kibby, as seller, delivered a Warranty Deed conveying the Property to Casselman and his wife Sharon J. Casselman. The Warranty Deed indicates that property tax assessments be sent to "Robert Casselman, c/o Valley Management." Valley Management was Debtor's business in which Casselman did not have an ownership interest.

11. Casselman advanced Debtor $76,500.00 and Debtor provided the remaining $90,000.00 to purchase the property for $166,500.00 cash. Casselman did not take any security in the loan to Debtor with the exception of maintaining possession of the Warranty Deed.

---

1. Pursuant to section 6321 of the Internal Revenue Code, the IRS "has the right to seize and sell real property of the taxpayer [who neglects or

refuses to pay any tax] *including the homestead* subject only to the owners right of redemption." 26 U.S.C. § 6321 (emphasis added).

12. After the closing on the Property, Debtor applied for homestead status that became effective in 1986.

13. While he denies it, I find that Casselman was aware of the federal tax lien when they entered into the transaction. Casselman clearly entered into the transaction knowing that Debtor was in financial distress and could not purchase the home in his own name.

14. On December 21, 1986, Debtor and Casselman signed a handwritten agreement reiterating that Casselman was the nominee and indicating the consideration for the transaction. The note reads: "To all concerned that I am a nominee owner for property belonging to Richard R. Curry and Nancy K. Curry—That the property is owned by them with the expectation that I am owed $76,500 by the Currys and that upon payment of that amount a Deed should be given to the Currys by Robert J. Casselman."

15. On February 11, 1987, Casselman and Sharon Casselman, as joint tenants, refinanced the Property and signed a mortgage in favor of Meritor Mortgage Corporation ("Meritor") in the amount of $120,000.00. Casselman retained $80,000.00 of the funds while Debtor took the remainder, approximately $40,000.00. At that point, Casselman had been repaid for the financing he had provided. If there was any element of a true financing arrangement, Casselman no longer had any interest in the Property. Yet Casselman remained the record owner and Debtor did not sign the mortgage. Meritor later assigned the mortgage and it is currently being serviced by Knutson Mortgage Corporation.

16. Neither the Contract nor the Assignment were recorded in the Hennepin County real estate records until July 26, 1991, when Nancy Curry recorded the Contract as part of the divorce proceedings.

17. Debtor did not directly inform the IRS or Hennepin County of Debtor's interest in the property until 1991.[2] From 1986 through 1990, the Hennepin County tax records identified the owner of the Property as "R.J. Casselman et al, Valley Management, 8000 Town Line Ave., Bloomington, MN 55438." Debtor's name started appearing on the Hennepin County tax records in 1991 as follows: "R.J. Casselman et al, R.R. Curry & R. Casselman, 9331 Xylon Cir., Bloomington, MN 55438."

18. The IRS refiled the federal tax lien in the amount of $52,835.94 on June 21, 1991.

19. Debtor has occupied the Property from October 29, 1986, to the present. Debtor has made all improvements to the property, paid all taxes, utilities, special assessments and insurance. Casselman has not exercised any incidents of ownership. While Debtor continues to own the Property, he is currently moving to a new address.

20. Debtor has never asked Casselman to place the property in Debtor's name, nor has Casselman requested that his name be taken off the title. Casselman indicates that he will remain title owner until Debtor pays the loan obligation to Casselman.

21. From 1986 through 1991, Casselman asserts he lent Debtor over $116,000.00 excluding the money lent for the purchase of the Property. He testified that on January 13, 1989, Debtor paid him $45,000.00 and has not paid him any money since. These separate loans are the subject of a separate adversary proceeding commenced by the trustee seeking to set aside Casselman's claim to an equitable mortgage in the Property.

22. Debtor filed a petition for relief under chapter 7 of the Bankruptcy Code on March 24, 1993. Debtor's schedules indicate the Property exempt as homestead property pursuant to section 510.01 of the Minnesota statutes. Debtor claimed the property to have a market value of $210,000.00 secured by a first mortgage in the amount of $114,000.00 in favor of Knutson Mortgage, and a second "equitable mortgage" in the amount of $140,000.00 in favor of Casselman. Debtor claimed no equity in the property. The trustee has objected to the claimed exemption.

23. The essence of the foregoing facts is that, in 1986, with the clear purpose and

2. Debtor maintains that he informed the taxing authorities of his ownership interest as early as 1986 merely by claiming the homestead exemption.

intent to hinder, delay and defraud his creditors, and to frustrate in particular the efforts of the IRS to seize all of his property, Debtor converted $90,000 in non-exempt cash into a homestead. At the time, he was insolvent. Then, for purposes of concealing his ownership interest in the Property from the IRS, Debtor transferred his ownership interest in the homestead to Casselman. Shortly thereafter Debtor and Casselman cashed out their investments in the Property or a portion of them by mortgaging the Property in the name of Casselman. Even though Debtor continued to reside in the home and receive all the benefits of ownership, he successfully concealed his ownership interest from public record until 1991 when his wife from whom he was separated first recorded it, apparently without his permission. Debtor filed his chapter 7 petition over seven years after the original conversion of non-exempt assets into the exempt homestead.

## DISCUSSION

■ Debtor claims a homestead exemption under section 510.01 of the Minnesota statutes, and as such, Debtor's right to an exemption is based upon state law. *Norwest Bank Nebraska, N.A. v. Tvetan*, 848 F.2d 871, 874 (8th Cir.1988); *In re Olson*, 45 B.R. 501, 514 (Bankr.D.Minn.1984). Minnesota case law liberally construes the homestead exemption and, as such, the exemption is to be viewed liberally in favor of the debtor. *Olson*, 45 B.R. at 504.

■ It is well settled that conversion of non-exempt assets into exempt assets is not sufficient, standing alone, to deprive a debtor of an exemption allowed under state law or the availability of a discharge provided by section 727(a) of the Code.[3] *See Tvetan*, 848 F.2d at 873–74; *Hanson v. First Nat'l Bank in Brookings*, 848 F.2d 866, 868 (8th Cir. 1988); *Forsberg v. Security State Bank of Canova*, 15 F.2d 499, 501 (8th Cir.1926);

*Park Nat'l Bank of St. Louis Park v. Whitney (In re Whitney)*, 107 B.R. 645, 650 (Bankr.D.Minn.1989). Such action is not fraudulent as to creditors because the debtor is merely making use of exemptions to which the debtor is legally entitled. *Tvetan*, 848 F.2d at 874. The ability to convert non-exempt assets into exempt assets is not absolute. Courts deny an exemption based upon extrinsic evidence that the debtor acted with actual intent to defraud creditors. *See Tvetan*, 848 F.2d at 876. *See also Abbott Bank–Hemingford v. Armstrong (In re Armstrong)*, 931 F.2d 1233, 1237 (8th Cir.1991); *Hanson*, 848 F.2d at 868–69; *McMormick v. Security State Bank*, 822 F.2d 806 (8th Cir. 1987); *Whitney*, 107 B.R. at 650–53; *Panuska v. Johnson (In re Johnson)*, 80 B.R. 953, 959–60 (Bankr.D.Minn.1987). The party objecting to the exemption has the burden of proving that the exemption is not properly claimed. Bankruptcy Rule 4003(c).

■ Under Minnesota law, in order to deny a homestead exemption based upon fraud, the court must find what amounts to a fraudulent conveyance. *Kangas v. Robie*, 264 F. 92, 94 (8th Cir.1920); *Olson*, 45 B.R. at 505; *In re McGlynn*, BKY 4–74–925(O) (Bankr.D.Minn. Feb. 8, 1979) (published as appendix to *Mickelson v. Anderson*, 31 B.R. 635, 639–63 (Bankr.D.Minn.1982)); *In re Tvetan*, 402 N.W.2d 551, 555 (Minn.1987). "Under Minnesota law, if conversion of non-exempt property to exempt property does not, of itself, constitute a fraud on creditors, what does? The answer lies in the Uniform Fraudulent Conveyance Act." *Tvetan*, 402 N.W.2d at 555.

■ The Minnesota Fraudulent Transfers Act ("UFTA"),[4] codified at Minn.Stat. § 513.-41–.51, provides:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose

---

**3.** The trustee contends that Debtor should be denied an exemption under Section 522(g) of the Code. Section 522(g) allows the debtor to claim an exemption in exempt property the trustee recovers. This right to exempt is limited to situations where the debtor has not transferred it voluntarily. For section 522(g) to apply, however, the trustee must have actually avoided the transfer. Here, the trustee has not commenced

an avoidance action but is merely objecting to the claim that the Property is exempt. Therefore, section 522(g) is not applicable.

**4.** In 1987, the Minnesota Legislature repealed the Uniform Fraudulent Conveyances Act and replaced it with UFTA.

before or after the transfers was made or the obligation incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor or the debtor....

Minn.Stat. § 513.44(a)(1) (1992).

Given the similarity between UFTA and section 727(a)(2) of the Code, numerous bankruptcy cases have decided factual determinations of fraud based upon a "badges of fraud" approach. *See, e.g., Whitney,* 107 B.R. at 650; *Citizens State Bank of Hayfield v. Leth,* 450 N.W.2d 923, 925 (Minn.Ct.App. 1990). In an effort to help courts arrive at such findings, the UFTA contains a lengthy list of "badges of fraud." These factors include whether:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was [not] reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the amount of the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Minn.Stat. § 513.44(b) (1992). An insider of an individual debtor includes: "a relative of the debtor or of a general partner of the debtor." Minn.Stat. § 513.41(7)(i)(A) (1992).

I find here ample evidence that Debtor was involved in a general scheme of fraud. Virtually all of the elements listed above are present in this case.

1. Debtor transferred the Property to Casselman who is arguably an insider but at the very least a close friend and business associate.

2. Debtor has retained possession and control of the Property since Casselman became title owner. Debtor has made all improvements to the Property, as well as paid all real estate taxes and expenses. Casselman has not exercised any incidents of ownership. This conduct is consistent with the Contract that provides Debtor with all the benefits and burdens of ownership.

3. Debtor has concealed both the transfer of the Property and the nature of his ownership interest. As to the actual transfer, Debtor failed to record both the Purchase Agreement and the Contract with Hennepin County. As a result, it was nearly impossible for the IRS to identify Debtor's interest which effectively precluded the IRS from levying on the property. Not until 1991 did these facts come to light and only after Nancy Curry recorded the Contract as part of the divorce proceedings.

Also, Debtor never informed the Hennepin County taxing authorities of his interest. Both the Warranty Deed and the county tax records indicate that assessments be sent to "Robert Casselman, c/o Valley Management." Debtor testified that Valley Management was Debtor's business and that Debtor paid all taxes on the Property since 1986.

Finally, at no time has Debtor or Casselman insisted that title be placed in Debtor's name. Both contend that this "financing arrangement" was devised to allow Debtor to purchase the property because Debtor was unable to obtain financing. If this were true, nothing would have prevented Debtor from becoming record owner after Casselman mortgaged the Property and cashed out his

investment. It is evident this was all done to conceal Debtor's ownership.

4. Debtor was threatened with the possibility of a foreclosure if he were to own the Property outright. Debtor responded to this threat when, one month after the IRS filed the lien, Debtor transferred his rights in the property to Casselman. This inference is fully supported by the plain language of the Contract which states that it was entered into "because of title clouds that could arise if the title were taken or held in the name of Owners at this time."

5. It can reasonably be inferred that the transfer of the Property consisted of substantially all of Debtor's assets. At the time of the transfer, Debtor was insolvent but yet appropriated the substantial sum of $90,-000.00 to purchase the Property.

6. The entire transaction was blatantly lacking in consideration. Neither the Purchase Agreement nor the Contract mention consideration. Only the December 21, 1986 handwritten letter to Debtor referenced a purchase price. This letter was drafted more than two months after they signed the Contract. Furthermore, Debtor has yet to repay any money owed in connection with the purchase.

7. During all phases of the transaction, Debtor was insolvent.

Debtor asserts that even if Debtor acted fraudulently, this court is without authority to deny the claimed exemption since the fraudulent actions occurred more than seven years ago. Therefore, Debtor argues that his actions were not in contemplation of bankruptcy.

█ Contrary to Debtor's contention, the fraudulent transaction seven years ago need not have been in anticipation of bankruptcy. This conclusion is inferentially supported by *In re Miera*, 104 B.R. 989 (Bankr.D.Minn.

1989). In *Miera*, the debtor, while engaged in a hunger strike, transferred exemptible homestead property to his sister in contemplation of death. *Id.* at 991. Debtor did so with the knowledge and intent that the transfer would remove the unencumbered value of his homestead from probate administration *Id.* While Judge Kishel never addressed whether the allegedly fraudulent transfer must have been in contemplation of bankruptcy, he did hold that a transfer in contemplation of death was actionable under section 727(a) of the Code. *Id.* at 995.

This conclusion is also consistent with Minnesota law and makes sense. Under the *Tvetan* line of cases, Debtor clearly would have been denied an exemption if the conversion occurred on the eve of bankruptcy. This begs the question: why should the result be different simply because the debtor's fraudulent actions occurred years before a bankruptcy? Had this case arose in state court, it would be treated as a fraudulent conveyance action under UFTA and the court would apply state court remedies.[5] Under UFTA it would be significant that Debtor transferred the Property at a time when he was being aggressively pursued by the IRS. There would be no need to find that Debtor filed for bankruptcy relief at any time.

Here, the only distinction is that the bankruptcy court is making the findings of fraudulent intent in accordance with state law. To allow the exemption simply because there was no nexus between the conversion and the bankruptcy proceeding would be to reward the debtor who successfully conceals fraud.

## CONCLUSION

For the reasons sets forth above, I conclude that the Debtor's transfer of the Property was sufficiently fraudulent under Minne-

---

5. In a case involving fraud, the statute of limitations is six years. Minn.Stat. § 541.05 subd. 1(6) (1992). This is not applicable in the present case since the trustee is not pursuing a fraudulent transfer action. Rather, the trustee is merely asserting that Debtor is not entitled to a claimed exemption based upon fraud. This court merely looks to UFTA to determine the standard of fraud in Minnesota.

Even if it were applicable, the fraudulent concealment of the existence of a cause of action postpones the tolling of the statute of limitations until either discovery or a reasonable opportunity to discover the facts exists. *Id.* *See also Wild v. Rarig*, 302 Minn. 419, 234 N.W.2d 775, 795 (1975). Arguably, the cause of action in the present case was not discoverable until 1991.

sota law so as to deny Debtor the claimed exemption in his homestead property.

ACCORDINGLY, IT IS HEREBY ORDERED THAT:

1. The trustee's objection to Debtor's claimed exemption is SUSTAINED; and

2. Debtor shall be denied his claim for a homestead exemption with regard to the property located at 9331 Xylon Court, Bloomington, Minnesota, 55438.